Mr. Chief Justice Shaekey
delivered the opinion of the court.
The appellee, Stratton, as the administrator on the estate of Shubal Foote, which had been reported insolvent, and an order made that the real estate should be sold, filed this bill to perfect the legal title to a lot in the town of Grenada, to which Foote in his lifetime had acquired an equitable title.
*425 Whether an administrator can, under such circumstances, claim to have the legal title to real estate perfected, is a preliminary question. Under different circumstances he could not of course. But on a deficiency of personal property, the probate court may decree a sale of the land, which, by law stands chargeable with the debts, in case the personal estate be insufficient. The sale is to be made by the administrator. Through him the proceeds of the sale, as assets, are to be administered. By the decree of sale the title of the heir is divested, and the administrator is so far invested with the legal ownership as to enable him to remove incumbrances, so that the decree of sale may be carried out for the best interests of the estate, and of the creditors. This being the case it becomes necessary to./ inquire whether the complainant in this bill^^ftajMsde out a proper case for the aid of a court of chanceras ^,
Foote, in his lifetime, purchased the lotljormne Bról $1000. He paid half in cash, and gave his irate and took a bond for title when the residue of the-11 money should be paid. This bond Foote tola of Smith, who was his indorser, as a securities: an IT After Foote’s death, John Williams took out let ry, and whilst he was acting as executor, sold the lot at private sale for $1400, to Stratton, Waters and Bingham, and received from them a cash payment of $500, which sum, as most of the witnesses state, he appropriated in discharge of the bal anee due Brown on the lot, and thereupon requested Brown to make title to Stratton, Waters and Bingham, which he did. Stratton, Waters and Bingham becoming dissatisfied with their bargain, agreed with Williams to rescind their contract of purchase, and to relinquish the $500 which they had paid, but their notes were to be delivered up, in consideration of which they agreed to convey the lot to Williams in his own right, and they accordingly made him a title. His letters testamentary were after-wards revoked, as having been improvidently granted.
On this state of things it is manifest that the sale by Williams to Stratton, Waters and Bingham, was void. It is equally clear that their conveyance back to him passed no title which *426 could prejudice Foote’s estate. The consequence is that Williams held the legal title as trustee for Foote’s heirs, and since his death his heirs hold in the same way.
But here a further question arises in regard to a lien claimed for Williams. It is contended that he discharged the debt on which Smith was indorser, to secure which the title bond was deposited, and that he has a right therefore to be substituted to the equity of Smith.
It would be difficult to sustain such a lien as that claimed, either on the law of the case, or the proof. A deposit of all the title deeds, as a security for a debt created at the time the deposit is made, is generally recognized as constituting an equitable mortgage. Such equitable liens have met with very decided opposition in England, though they have been generally sustained, but it is admitted on all hands that they should not be extended beyond their present limit. Such a mortgage is in direct opposition to the statute of frauds, in regard to which we have said that we will create no exceptions not found in the statute. Lord Eldon said that in departing from the rule of the statute, there was no rule to go by; and it was essential that those who wished to render such securities valid should learn the utility of requiring two or three lines in writing. A transfer of these equitable mortgages may be made, but it must be done in the way they are at first created, by a deposit of the deeds as a security. See 3 Powell on Mortgages, 1050-1061. It is not necessary that we should hold such mortgages to be invalid in any case. The record does not furnish evidence that Smith delivered the title-bond to Williams to be held as a security. If he did so, Williams no doubt delivered it to Brown, the original vendor. He thereby parted with the deposit which constituted the mortgage, and did he not thereby part with the lien % No case has been cited in which such an equitable mortgage has been preserved to this extent. The equitable mortgage arises by the single act of deposit, and that act must be unequivocal. It differs very materially from a legal mortgage, which is transferred by the transfer of the debt, because it is an express lien, clearly and *427 precisely defined by the written contract of the parties. It differs also from the lien of a vendor who gives a title-bond.
But apart from the question of law, there is some confusion in the testimony as to the actual payment by Williams of the money which is said tobe the foundation of the lien. Bingham, who was one of the purchasers from Williams, states that when they purchased the lot, the title-bond was in the hands of Smith, as security for his indorsement on a note for $500, which had been given by Foote for the last payment of the purchase-money, and the $500 paid by him and his co-purchasers, were appropriated by Williams to the payment of that note. It was necessary that the note should be paid at maturity, to prevent Smith from holding the lot, which was then considered to he worth more money. This witness details the transaction with great precision, and concludes 'by saying that his statement is made from his own knowledge.
Bryan makes .the same statement. He says that Foote purchased the lot of Brown for $1000; paid $500 in cash, and gave his note for the balance, which was paid by Williams with the money received from Stratton, Waters and Bingham for the lot. Pettybone confirms, in substance, the testimony of these witnesses.
A. C. Baine, who was examined for the respondents, states that the title-bond was deposited by Foote with Smith, to secure him for his indorsement on a note for $900, or $1000, he thinks the latter sum, and that Smith was anxious to take the lot, about which Williams expressed much anxiety, and stated to the witness that he could borrow the money at a high per cent. He states that Williams did borrow the money, he thinks from Ingram, and paid the debt. The note on which Smith was indorser, was discounted in the Commercial Bank of Manchester, for the benefit of the person from whom Foote purchased ; or, that it was made payable there and deposited for collection. Mr. Baine obtained his information partly from Williams, Foote, and from his own knowledge of the transaction. It is possible Mr. Baine’s memory may have failed him, in regard to the minutice of this transaction. There seems *428 to be no doubt but what Foote gave $1000 for the lot, and paid $500 in cash, and gave his note for the balance. If the note was discounted in bank for the benefit of the vendor, from whom Foote purchased, it would seem that it could only have been given for $500; yet it is possible that Foote may have borrowed the first payment made by him, from the bank, and in this way become indebted in the sum of $1000. This supposition, however, rests upon conjecture. Smith could have explained this transaction, and so could Brown, and they should have been examined. There is too much uncertainty in the testimony about the sum paid by Williams, to sustain an equitable mortgage. Such a lien can only be established on clear proof. It seems certain that Williams paid $500, but that sum he received by the sale of the lot. For this he is not entitled to a lien. The property of a deceased person is not to constitute a subject for speculation in the hands of his representative. He can make no illegal disposition of it, and then claim a benefit from his own wrong.
It is objected that the decree was improper as to the minor heirs of Williams. They answered by their guardian ad litem,, and we must presume, as the vice-chancellor received their answer, that a guardian had been appointed for the purpose. The decree contains no saving as to their rights; in that particular they may be protected by the decree of this court.
The decree seems to be defective also in this, that it does not direct that a title shall be made by Williams’s representatives to Foote’s heirs.
Decree affirmed.